COMMONWEALTH of Pennsylvania, Appellee,

v.

Jason David KEARNS, Appellant.

Superior Court of Pennsylvania.

Submitted Dec. 5, 2005.

Filed Aug. 31, 2006.

---

Robert J. Trambley, Meadville, for appellant.

Francis J. Schultz, Meadville, for appellee.

BEFORE: DEL SOLE, P.J., BENDER, J. and McEWEN, P.J.E.

OPINION BY BENDER, J.:

¶ 1 This is an appeal from a judgment of sentence imposed upon Appellant, Jason David Kearns, after he was convicted in a jury trial of involuntary manslaughter, aggravated assault, endangering the welfare of children, escape and resisting arrest. Appellant raises two issues for our review; we restate them as follows:

> whether the Due Process Clause of the Fourteenth Amendment and the Sixth Amendment right to jury trial compelled that the jury return a specific finding that the victim was under the age of 12 years and in the care, custody or control of the person who caused the death prior to the court being authorized to sentence Appellant on involuntary manslaughter graded as a felony of the second degree; and

> whether the court abused its discretion in sentencing him to a term of 14¼ to 29 years on his convictions for aggravated assault and involuntary manslaughter as

the sentence was inconsistent with and compromised the purpose of the sentencing guidelines and generally violated the norms underlying the sentencing code?

After careful study of the within case, we vacate the sentence imposed on the involuntary manslaughter charge and remand for resentencing in a fashion consistent with the discussion that follows.

¶ 2 The charges in the instant case stem from the death of S.P., the nearly three year-old daughter [1] of Appellant's girlfriend, Charyn Parsons. Appellant was residing with Ms. Parsons and S.P. in a basement apartment located in Conneautville, Crawford County, during the relevant time period and was involved in the use and manufacture of methamphetamine. During the afternoon and evening of March 4, 2004, Appellant, Ms. Parsons and S.P. traveled throughout Erie and Crawford Counties stopping at grocery, drug or other stores which carried cold medicine to purchase decongestant tablets for use in the manufacturing of methamphetamine. During this period of time, both Appellant and Ms. Parsons ingested methamphetamine on at least three or four occasions.

¶ 3 After Appellant obtained a bag full of over-the-counter cold medicine, the three returned to their residence between 11:00 p.m. and midnight, whereupon Ms. Parsons fed S.P. some cereal and then attempted to put the child to bed. S.P. was a bit restless and wanted her favorite stuffed animal, which had been left in the car. Ms. Parsons then went outside to retrieve the stuffed animal and left her daughter in bed. N.T. Trial, 3/15/05, at 65. Ms. Parsons testified that when she left to retrieve the stuffed animal, S.P. was alert and lying in bed with no indication that

there was anything wrong with her. *Id.* Ms. Parsons was gone for approximately three to five minutes. Upon returning, she found her daughter lying on the floor in the doorway of the bedroom in a state of unconsciousness and with blood in her saliva. *Id.* at 67, 69. During the time that Parsons left her daughter, Appellant was the only person in the apartment. *Id.* at 65–66.

¶ 4 At first Ms. Parsons believed the child had fallen out of bed and would be all right. However, soon Ms. Parsons became alarmed upon perceiving that S.P.'s breathing and heart rate seemed abnormal. Ms. Parsons called 911 and the paramedics arrived and took her daughter to the hospital. S.P. died on April 6, 2004, having never regained consciousness. At trial, Rachel Berger, M.D., a specialist in Pediatrics and Child Abuse Medicine, testified that the victim had multiple injuries. N.T. Trial, 3/16/05, at 97. These included a fractured skull, bleeding in the brain, a liver laceration, and multiple bruises on her ears, face, and chest. *Id.* at 97–98.

¶ 5 At the conclusion of trial, a jury found Appellant guilty of the aforementioned offenses and, on May 4, 2005, the trial court sentenced Appellant to a period of incarceration of 15¼ to 31 years. With respect to the charge of involuntary manslaughter, the court imposed a sentence of six to 12 years' imprisonment, noting at the time of sentencing that the charge of involuntary manslaughter was to be graded as a felony of the second degree. N.T. Sentencing, 5/4/05, at 3. The court imposed this sentence despite the fact that the jury was not charged that in order to find Appellant guilty of involuntary manslaughter they must find that the victim

1. The record reveals that S.P. was five weeks shy of her third birthday when she suffered the injuries that ultimately proved fatal.

was under 12 years of age and also in the care, custody or control of the person who caused the death, and despite the fact that the verdict form did not reflect this finding.

¶ 6 On May 12, 2005, Appellant filed a motion to modify sentence asserting that the sentence imposed on the involuntary manslaughter charge was illegal in two respects. First, Appellant asserted that the maximum sentence of 12 years' imprisonment exceeded the statutorily authorized maximum sentence for a second degree felony which, at 18 Pa.C.S. § 1103, is set at 10 years' imprisonment. Second, Appellant asserted that since there was no specific finding by the jury that the victim was in Appellant's "care, custody and control" at the time of the alleged incident, Appellant could only be sentenced for a misdemeanor of the first degree, with a maximum sentence of five years' imprisonment. In support of this assertion, Appellant cited the case of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Appellant's Motion to Modify Sentence, at ¶ 8. Appellant's motion was denied the next day. However, on May 16, 2005, the court amended its prior sentence in part. Acknowledging that the sentence of 12 years exceeded the statutory maximum of 10 years' imprisonment, and terming the imposition of a greater sentence an elementary oversight, the court modified the sentence on involuntary manslaughter to five to 10 years' imprisonment. The "amended sentence" order did not address Appellant's *Apprendi* challenge. Appellant's aggregate sentence after correction was 14¼ to 29 years' imprisonment. The instant appeal was then filed and counsel submitted a petition to withdraw and an *Anders* brief.[2]

¶ 7 Upon our initial review of counsel's *Anders* Brief, we concluded that although counsel had followed the requirements necessary to withdraw under *Anders,* we disagreed that the appeal was wholly frivolous. To the contrary, we concluded that the single issue argued in the *Anders* Brief was, upon its face, of arguable merit and deserved the full attention of an advocate's brief as well as a brief in response should the Commonwealth choose to file one.[3] Thus, we remanded the matter for the filing of an advocate's brief. *Commonwealth v. Kearns*, 896 A.2d 640 (Pa.Super.2006) *(Kearns I).* That brief has been filed, as has the Commonwealth's brief in response, bringing us to the present juncture.

¶ 8 Appellant contends that sentencing him in excess of five years' imprisonment on the involuntary manslaughter conviction violated his Fifth Amendment right to trial by jury as set forth in *Apprendi.* Citing to the portion of *Apprendi* wherein the Court states "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond reasonable doubt," *Apprendi,* 530 U.S. at 490, 120 S.Ct. at 2362–63, Appellant contends that *Apprendi* requires a jury to find the facts that under the involuntary manslaughter statute elevates the grading of that offense from a misdemeanor of the first degree to a felony of the second degree. After considerable study, we must announce our agreement with this proposition.

**2.** *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

**3.** The Commonwealth declined to file a brief in response to the *Anders* Brief but "reserved the right" to file a responsive brief in the event this Court concluded that an *Anders* Brief was an inappropriate filing.

¶ 9 We first examine the terms of involuntary manslaughter.

### § 2504. Involuntary manslaughter

**(a) General rule.**—A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

**(b) Grading.**—Involuntary manslaughter is a misdemeanor of the first degree. Where the victim is under 12 years of age and is in the care, custody or control of the person who caused the death, involuntary manslaughter is a felony of the second degree.

18 Pa.C.S. § 2504. As one can see from a review of the "Grading" section of involuntary manslaughter, the offense is deemed a misdemeanor of the first degree except where the victim was under 12 years of age and was in the care, custody or control of Appellant at the time the injuries were inflicted, in which case the offense is graded a felony of the second degree. A misdemeanor of the first degree carries a maximum sentence of five years' imprisonment whereas a felony of the second degree carries a maximum sentence of 10 years' imprisonment. Tracking the holdings of *Apprendi* and its progeny, Appellant contends that since the jury did not find beyond reasonable doubt that the victim was under 12 years of age and was in the care, custody or control of Appellant at the time the injuries were inflicted, the court was limited to sentencing Appellant to involuntary manslaughter graded as a misdemeanor of the first degree. We now examine the holding of *Apprendi*.

¶ 10 In *Apprendi*, the United States Supreme Court reviewed a New Jersey sentencing statute that provided for the "enhancement" of a sentence if the sentencing court found that the condition(s) for enhancement was proven by a preponderance of the evidence. The condition for enhancement in *Apprendi* was that " 'the defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.' N.J.S.A. 2C:44–3(e)." [4] *State v. Apprendi*, 159 N.J. 7, 10, 731 A.2d 485, 486 (1999). Under the provisions of the statute, after a conviction or entry of a guilty plea to a qualifying crime, the state prosecutor could move the court to impose an enhanced sentence. A sentencing hearing would follow, complete with the hearing of testimony and the receipt of evidence, after which the court would decide whether the state had proven the existence of the condition for enhancement by a preponderance of the evidence.

¶ 11 Under the above statutory framework, Apprendi pled guilty to two counts of second-degree possession of a firearm for an unlawful purpose and one count of third-degree unlawful possession of an anti-personnel bomb. Under New Jersey law, a second degree felony carried a range of punishment of five to ten years' imprisonment. As part of the plea agreement, the State reserved the right to request imposition of an enhanced sentence

---

4. The statutory provision reads:

The court shall, upon application of the prosecuting attorney, sentence a person who has been convicted of a crime, . . . to an extended term if it finds, by a preponderance of the evidence, the grounds in subsection e.

. . .

e. The defendant in committing the crime acted, at least in part, with ill will, hatred or bias toward, and with a purpose to intimidate, an individual or group of individuals because of race, color, religion, sexual orientation or ethnicity.

*State v. Apprendi*, 304 N.J.Super. 147, 150, 698 A.2d 1265, 1266 (1997).

under N.J.S.A. 2C:44–3(e) with respect to one of the unlawful possession of a firearm offenses. That request was made after the court accepted the plea agreement and a sentencing hearing followed. After hearing relevant evidence, the sentencing court concluded that the state had proven by a preponderance of the evidence that Apprendi's crime of possessing a firearm for an unlawful purpose was motivated by "racial bias."[5] Pursuant to the above finding, the court was empowered to impose a sentence from 10 to 20 years' imprisonment on the count in question,[6] and the court thus imposed a sentence of 12 years' imprisonment. Apprendi appealed the decision, first to the Superior Court of New Jersey and then to the New Jersey Supreme Court, contending that allowing the imposition of the enhanced sentence upon the State's proof by a preponderance of the evidence violated the Due Process clause. However, ultimately, the appellate courts of New Jersey disagreed. Relying in part upon *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), they concluded that the State of New Jersey had, like Pennsylvania before it, chosen to make racial bias a "sentencing factor" and that Due Process concerns did not compel a different result.

■ ¶ 12 On appeal to the United States Supreme Court, the Court, breaking away from the stance taken in *McMillan*, was disinclined to allow New Jersey's explicit characterization of racial bias as a "sentencing factor" to determine the constitutional analysis. Rather, the Court recognized that traditionally "facts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense." *Apprendi*, 530 U.S. at 483 n. 10, 120 S.Ct. at 2359 n. 10. The Court then concluded that the Due Process Clause contained in the Fourteenth Amendment to the United States Constitution, in combination with the Sixth Amendment right to trial by jury, required that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond reasonable doubt. The Court recited its holding thusly:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

*Id.* 530 U.S. at 490, 120 S.Ct. at 2362–63. In reaching the conclusion that the New Jersey sentencing enhancement statute violated the Constitution, the Majority found the view expressed in the Concurring Opinion of Justice Stevens in *Jones v. United States*, 526 U.S. 227, 252–53, 119 S.Ct. 1215, 1228–29, 143 L.Ed.2d 311 (1999), persuasive and endorsed that view as law:

> It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.

*Apprendi*, 530 U.S. at 490, 120 S.Ct. at 2363.

■ ¶ 13 In our assessment, the present case cannot be meaningfully distinguished from *Apprendi*. Under the provisions of 18 Pa.C.S. § 2504(b), involuntary manslaughter is graded as a misdemeanor of

---

5. "Racial bias" is the term New Jersey courts seemingly use to characterize the statutory enhancement factor quoted above.

6. The effect of the enhancement was to allow punishment as if the crime were graded a first degree felony.

the first degree unless the victim is under 12 years of age and is in the care, custody or control of the person who caused the death, in which case the offense is to be graded as a felony of the second degree. A misdemeanor of the first degree carries a maximum penalty of five years' imprisonment, whereas a felony of the second degree carries a maximum penalty of ten years' imprisonment. As such, the factual determinations that the victim was under 12 years of age and in the care, custody or control of the person who caused the death exposes the charged defendant to five years' greater maximum punishment than the general verdict of guilty of involuntary manslaughter allows. Thus, pursuant to *Apprendi*, these factual determinations constitute elements of the offense of involuntary manslaughter graded as a felony of the second degree and must be either admitted by the defendant or found by a jury beyond reasonable doubt.

¶ 14 In response to the remand of this case for the filing of an advocate's brief and the subsequent filing of that brief, the Commonwealth has chosen to file a responsive brief of its own. In this brief the Commonwealth contends that:

The crime of involuntary manslaughter as defined by Pennsylvania Statute 18 Pa.C.S.A. § 2504(a) is one single statute with two sections. The first section defines all the elements of the crime and the second defines sentencing factors that determine the grading of the offense, but in no case does the statute increase the maximum sentence beyond that of a felony of the second degree the maximum allowed under the definition of involuntary manslaughter. Subsection (b) of 18 Pa.C.S.A. § 2504 merely indicates that if the victim is less than 12

years of age and the [sic] care, custody and/or control of the defendant those sentencing factors may determine whether the crime of involuntary manslaughter is graded as a felony of the second degree.

Commonwealth's Brief at 12. The Commonwealth later contends:

Whether the victim is less than 12 years of age and the Appellant has care, custody and/or control of the victim are merely sentencing factors to be determined by the court as part of the involuntary manslaughter grading portion of the offense. No separate statute comes into play in determining whether or not a defendant will receive a maximum sentence beyond the maximum allowed by the definition of involuntary manslaughter, *i.e.* a felony of the second degree.

*Id.* at 15.

¶ 15 In arguing that the key facts that alter the grading of the offense are merely sentencing factors, the Commonwealth seemingly overlooks the United States Supreme Court's stance in *Apprendi* that labeling facts "sentencing factors" does not control the issue.[7] Moreover, as noted above, in *Apprendi*, the United States Supreme Court adopted Justice Stevens' concurring assertion from *Jones*, which reads:

It is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.

*Jones*, 526 U.S. at 252–53, 119 S.Ct. at 1228–29.

¶ 16 In light of this overview of the *Apprendi* ruling, the key to determining whether facts that influence punishment are sentencing factors or elements of the

7. We note that unlike the mandatory minimum statute found in *McMillan,* the involuntary manslaughter statute does not label these vital facts as "sentencing factors." In the present case, this terminology is uniquely the Commonwealth's.

crime is their effect on the sentencing judge's ability to impose punishment. In the present case, the maximum sentence that could be imposed upon a criminal defendant for involuntary manslaughter in the absence of a finding that both the victim was under the age of 12 and was in the care, custody or control of the person who caused the death of the victim, is five years. However, if both of those factors are found to be fulfilled, the judge can impose a sentence of up to 10 years. Since the finding of the two facts allows for the imposition of a greater punishment than could otherwise be imposed, the facts constitute *de facto* elements of a separate offense. That is, even though the statute purports to define only one offense, the effect of the statute's wording is to create two separate offenses, bearing two separate gradings, which then creates two separate ceilings of punishment.

¶ 17 Given that the recent *en banc* decision of this Court in *Commonwealth v. Kleinicke*, 895 A.2d 562 (Pa.Super.2006), stands as the most authoritative decision on the application of *Apprendi* in Pennsylvania so far, we would be remiss in not discussing and, to the extent necessary, distinguishing that decision. After review, we conclude that *Kleinicke* does not affect the above analysis of the present case as the *en banc* panel specifically distinguished the facts of *Kleinicke* from *Apprendi*. In fact, upon detailed inspection, it would appear that *Kleinicke* strengthens our analysis.

¶ 18 *Kleinicke* involved the applicability of mandatory minimum sentence provisions of 18 Pa.C.S. § 7508 involving drug possession offenses, in Kleinicke's case, those relating to the growing of marijuana. Where a defendant's conviction of violating 35 P.S. § 780–113(f) is based upon the possession or manufacture of marijuana, section 7508 requires the imposition of a mandatory minimum sentence of five years' imprisonment "when the amount of marijuana involved is at least 50 pounds, or at least 51 live plants." 18 Pa.C.S. § 7508(a)(1)(iii). On a raid of Kleinicke's home, 693 plants were seized, all suspected of being marijuana. However, only 15 plants were actually tested and all tested positive for marijuana. At the conclusion of Kleinicke's trial—in which he was found guilty of manufacturing marijuana—at Kleinicke's request, the jury was polled as to the number of marijuana plants Kleinicke had possessed/manufactured. All but one member of the jury responded that Appellant had possessed 693 marijuana plants. The lone holdout, apparently influenced by the Commonwealth's failure to test all of the suspected marijuana plants, stated that Appellant possessed only 15 plants. Despite the jury's lack of unanimity as to Appellant's possession of 51 or more live marijuana plants, the court imposed the mandatory minimum sentence upon its own finding that Appellant possessed at least 51 live plants.

¶ 19 On appeal, Kleinicke argued that the court's imposition of the mandatory minimum sentence based upon the court's own finding violated the decision in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). *Blakely* was the United States Supreme Court's follow-up decision to *Apprendi* and involved a Washington statute that, while not changing the grading of the crime or otherwise affecting the applicable maximum sentence for a crime, allowed for the enhancement of a sentence upon the sentencing court's finding that a crime was committed with "deliberate cruelty." *Blakely*'s sentence was in fact enhanced beyond the presumptive sentence set forth in the Washington sentencing guideline's due to the court's finding that his crime, kidnapping, was committed with deliberate cruelty. Of course, since the enhancement provision

affected neither the grading of the offense nor the putative maximum sentence, the enhanced sentence imposed by the court remained within the statutory maximum sentence allowed for kidnapping. Thus, upon its face, *Blakely* presented a different scenario than *Apprendi.*

¶ 20 Nevertheless, on appeal to the United States Supreme Court, *Blakely* was decided in a fashion similar to *Apprendi.* The Court found that the trial court's enhancement of the presumptive guideline sentence based upon its finding of fact violated the *Apprendi* rule even though the grading of the offense remained the same, and even though Blakely's sentence, after enhancement, remained within the limits allowed by statute. Key to the Court's decision was an expansive definition of the term "statutory maximum" as utilized in *Apprendi.* The Court recited the essence of its holding:

> In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," *Bishop, supra,* § 87, at 55, and the judge exceeds his proper authority.

*Blakely,* 542 U.S. at 303–04, 124 S.Ct. at 2537.

¶ 21 In his appeal to this Court, Kleinicke built upon the *Blakely* holding and likened the Washington statute to the Pennsylvania mandatory minimum statute because in both cases the judicial factfinding did not change the grading of the crime, nor move the sentence beyond what was statutorily authorized for the crimes in question, but in both cases the sentence received was presumptively larger than

what would have been imposed absent the judicial factfinding.

¶ 22 The *Kleinicke* Majority acknowledged the precedent of *Apprendi,* but found that the mandatory minimum sentence provisions of section 7508 did not violate *Apprendi* because the judicial factfinding required by section 7508 did not increase the maximum penalty applicable to Kleinicke, which due to his conviction of a misdemeanor of the first degree, was set by statute at up to five years' imprisonment. Distinguishing the Washington sentencing scheme, which imposed only a single determinate term of imprisonment, from Pennsylvania's indeterminate sentencing scheme, which imposes a minimum and maximum sentence, the *Kleinicke* Majority stressed that *Apprendi* applies only when the additional factfinding increased the potential maximum punishment the defendant faced. With respect to *Blakely's* liberal definition of the term "statutory maximum," in the opinion of the *Kleinicke* Majority, *Blakely* merely clarified the meaning of the term "statutory maximum" upon which *Apprendi* hinges.

¶ 23 Perhaps the best summation of the *Kleinicke* distinction comes in the following paragraph, which appears very instructive in the disposition of this case:

> The mandatory provisions set forth in section 7508 do not increase the statutory **maximum** punishment or change the grade of the crime based upon the number of plants involved. To the contrary, section 7508 regulates only the minimum sentence. Whereas this section serves to limit the court's discretion regarding the manner or method of imposing the sentence, it does not increase the maximum punishment for the conviction.

*Kleinicke,* 895 A.2d at 574.

¶ 24 As set forth above, here the additional factfinding necessitated by the lan-

guage of the involuntary manslaughter statute exposed Appellant to a maximum of ten years' imprisonment as opposed to five years' imprisonment. Thus, *Kleinicke* is clearly distinguishable. Moreover, the rationale enunciated in *Kleinicke* suggests that the statute at issue here falls squarely within the *Apprendi* holding.

¶ 25 The Commonwealth's next argues that, even if *Apprendi* is applicable to the present case, *Apprendi* was not violated because "the Commonwealth presented uncontradicted testimony at the time of trial that was considered by the jury that the victim was less than 12 years of age, *i.e.* two years and that the victim was in the care, custody and/or control of the Appellant." Commonwealth's Brief at 15. In so arguing, the Commonwealth appears to argue that despite the fact that the jury did not render an answer to a special interrogatory, "the Commonwealth did prove beyond reasonable doubt that [S.P.] was two (2) years old at the time of her death at the hands of Appellant Jason Kearns and that she was in the care, custody and/or control of [Appellant,] the person who caused her death." *Id.* at 18. The answer to this argument should be apparent. No matter the volume of evidence presented, nor the quality of the evidence, or even a lack of contrary evidence, the production of evidence cannot stand as a proxy for a specific finding by the factfinder. If the preceding were not true, then irrespective of the jury's verdict an acquittal could be set aside if a reviewing court concluded that the premise of guilt had been conclusively established. Indeed, there would be no point in proceeding to jury deliberation in some cases. If the court concluded at the close of evi-

dence that the defendant's guilt had been "conclusively proven," the court would be entitled to enter a guilty verdict directly. Of course, this is not the law, nor could it be if we are to preserve the constitutional right to trial by jury. Moreover, it is axiomatic that "the trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence." *Commonwealth v. Watkins*, 577 Pa. 194, 843 A.2d 1203, 1211 (2003). This principle of law relegates the factfinding process to the jury, even where the ultimate finding seemingly flies in the face of the uncontradicted evidence.[8]

¶ 26 The Commonwealth next points to the fact that the jury found Appellant guilty of endangering the welfare of a child (EWC) and seemingly argues that that conviction constitutes a jury's finding beyond reasonable doubt that S.P. was in the care, custody or control of the person who caused the death sufficient to satisfy *Apprendi*. We disagree. We touched upon this potential argument in *Kearns I* while commenting that the premise that "a factual finding extrapolated from one conviction could be used to satisfy an enhancement or escalation on another charge altogether" appeared to be without precedent. *Kearns I*, 896 A.2d at 645. In so commenting, we foreshadowed the tenuousness of this position. Although that issue was not squarely in front of the Court at that time and was discussed primarily to defeat the notion that the issue was "wholly frivolous," today we conclude that the jury's conviction of Appellant of (EWC) does not satisfy the "in the care, custody or control of the person who

---

8. The proviso to this being the safeguard of granting a new trial when the jury's verdict of guilty is so contrary to the evidence as to shock one's conscience. Notably, the sovereign is not afforded the same jury nullification safeguard when the jury acquits in the face of overwhelming evidence of guilt.

caused the death" element of involuntary manslaughter for purposes of *Apprendi*.

■ ¶ 27 The first and greatest difficulty with relying upon the jury's finding of guilt on the EWC charge to satisfy the enhanced grading requirement is that doing so requires a form of intra-case collateral estoppel and we are not aware of any precedent for such an application and, indeed, the precedent seems to hold the contrary. Although discussing collateral estoppel in a civil case, *Griffin v. Central Sprinkler Corp.*, 823 A.2d 191 (Pa.Super.2003), states that a finding within the same litigation cannot provide the basis for application of collateral estoppel.[9] Moreover, the fact that inconsistent verdicts are allowed, *see Commonwealth v. Frisbie*, 889 A.2d 1271 (Pa.Super.2005), seemingly lends support to the opposite proposition. If intra-case collateral estoppel was allowable, in the case of mutually exclusive verdicts, either the Commonwealth or the defendant could assert a right to a conviction/acquittal as to the other charge. Of course, this has not been allowed. Instead, inconsistent verdicts are tolerated as either a mistake of the jury or the jury's exercise of a right to leniency which they do not rightfully possess. *See*

*Commonwealth v. Petteway*, 847 A.2d 713, 718 (Pa.Super.2004).[10]

¶ 28 A second impediment to relying upon the jury's finding of guilt on the EWC charge to satisfy the enhanced grading requirement is that the elements of the two offenses are not identical. The offense of endangering the welfare of a child follows:

**§ 4304. Endangering welfare of children**

(a) **Offense Defined.**—A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa.C.S. § 4304.

¶ 29 In order to find a person guilty of EWC, the jury must conclude that a parent, guardian or "other person supervising the welfare of a child" endangered the welfare of the child by violating a duty of care, protection or support whereas involuntary manslaughter graded as a felony 2 requires a finding that the victim was under 12 and "in the care, custody or control of the person who caused the death." Thus, upon their face, the two provisions are not identical. This circumstance natu-

9. On this issue we stated: "[t]he doctrine of collateral estoppel requires the determination on the merits in a prior case or proceeding of an issue central to the current litigation. *Id.* As the above discussion demonstrates, there has been but one action litigated here. By its description, the doctrine of collateral estoppel does not apply to 'prior determinations' within the same case." *Griffin*, 823 A.2d at 195.

*Cf. Lutheran Day Care v. Snohomish County*, 119 Wash.2d 91, 829 P.2d 746 (Wash.1992), where collateral estoppel was applied within the same case where that case had been bifurcated. There, a finding that the County acted arbitrarily and capriciously in denying the conditional use permit made in the certiorari part of the litigation was held to have been

conclusively established in the second portion of the litigation for damages. The Court noted that the County had an opportunity to appeal the certiorari decision, but did not. Therefore, the Court, although finding the context unusual, concluded that the "two separate superior court actions can therefore be considered 'different cases' for purposes of discussing collateral estoppel." *Id.* at 757.

10. Stated alternatively, "[t]he rationale for allowing inconsistent verdicts is that it is the jury's sole prerogative to decide on which counts to convict in order to provide a defendant with sufficient punishment." *Commonwealth. v. Miller*, 441 Pa.Super. 320, 657 A.2d 946, 948 (1995).

rally invokes a second question, can similar but less than identical phrases be considered the same for *Apprendi* purposes? To the extent the answer to this question is "yes," an attempt to satisfy *Apprendi* by piggybacking upon a similar necessary finding extracted from a different conviction creates a quandary similar to the one discussed above. That is, satisfaction of the *Apprendi* requirement would result not from a specific finding of the jury upon a charge using the key statutory language but, rather, satisfaction would hinge upon a comparison of the relevant statutory language by the court to determine whether the finding inherent in the one conviction satisfies the finding necessary for the imposition of the enhanced sentence. Again, to our knowledge, there is no precedent for satisfying *Apprendi* in this manner.

¶ 30 Along the same lines, to the extent the Commonwealth's position is founded upon the notion that, despite the differences in the literal language, the two phrases in question have the same essential meaning, the Commonwealth's position must be regarded as tenuous since it is not at all clear that the two phrases have the same meaning. This ambiguity results, in large part, because neither phrase has been subject to much definition via case-law.

¶ 31 There appears to be few reported cases discussing the phrase "supervising the welfare of a child." One of the cases that does discuss this phrase, *Commonwealth v. Brown*, 721 A.2d 1105 (Pa.Super.1998), indicates that the term is to be interpreted broadly and represents a factual determination to be made on a case-by-case basis. The *Brown* panel states "[b]y showing that the adult played with the child, bathed the child, ate with the child, babysat the child, or otherwise interacted with the child, the prosecution can prove that the adult was supervising the

child during the time he resided with the child." *Id.* at 1108 n. 6. Ultimately, the panel concluded that the evidence of "appellant's actions including periodic babysitting, diaper-changing, and playing with Christopher," *id.* at 1108, was sufficient to support the jury's finding that Brown had been supervising the welfare of a child for purposes of the EWC statute. Of course, the *Brown* decision begs the question, would periodic babysitting, diaper-changing, and playing with a child legally satisfy the phrase "in the care, custody or control" of the child? Essentially, we have no way of knowing. Moreover, determining whether or not satisfying the phrase "supervising the welfare of a child" also legally satisfies the phrase "in the care, custody or control of the person who caused the death" is made more difficult by the fact that, since the latter phrase has not heretofore been construed to be an element of involuntary manslaughter, the phrase has not been defined for purposes of grading involuntary manslaughter in the reported cases dealing with the offense.

¶ 32 Thus, the question whether the two phrases encompass the same status is certainly an unsettled matter. Of course, it is not sufficient that the two phrases are substantially similar or substantially overlap. Unless the two phrases are construed in identical fashion, and the jury so charged, the jury's finding as to "supervising the welfare of a child" would not satisfy "in the care, custody or control of the person who caused the death" because it would be unclear whether the jury's finding rested upon a conclusion that fell within the first definition but not within the one of importance for our inquiry.

¶ 33 Lastly, *Apprendi* is founded upon the constitutional right to trial by jury. Referencing this rule of law, the right to trial by jury in the context of enhancing sentences based upon factual findings

would be rendered meaningless if enhancement could follow a review of the evidence as opposed to the issuance of a specific finding. Indeed, absent a specific finding by the jury, the jury plays no role in the imposition of the greater sentence and the findings are, in fact, relegated to sentencing factors. Since our *Apprendi* analysis indicates that the facts in question are, in reality, elements, preservation of the right to trial by jury mandates that the jury render a specific finding beyond reasonable doubt as to these facts.

¶ 34 In his second issue, Appellant contends that the court abused its discretion in sentencing him to a term of 14¼ to 29 years' imprisonment on his convictions for aggravated assault and involuntary manslaughter as the sentence was inconsistent with and compromised the purpose of the sentencing guidelines and generally violated the norms underlying the sentencing code. Because of our holding with respect to Appellant's first issue, it will be necessary to remand the present case for resentencing. Thus, until Appellant is resentenced, his second issue is premature.

¶ 35 For the above reasons, we will remand the case for resentencing. Appellant must be sentenced on involuntary manslaughter graded as a misdemeanor of the first degree.

¶ 36 Judgment of sentence vacated, remanded for resentencing. Jurisdiction relinquished.